**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TADEUSZ STROSIN and KRYSTYNA STROSIN, | : | |
| Plaintiffs | : | NO. 5:14-cv-07085-LS |
| | : | |
| v. | : | |
| | : | |
| THE J.M. SMUCKER COMPANY | : | |
| and | : | |
| THE FOLGERS COFFEE COMPANY | : | |
| and | : | |
| EXEL LOGISTICS, | : | |
| Defendants | : | |

## O R D E R

**AND NOW**, this _____ day of _____ 2016, upon consideration of Defendants' Motion for Partial Summary Judgment (Doc. No. 49-2, 50, 51), and Plaintiffs' response in opposition thereto, it is hereby **ORDERED** and **DECREED** that said Motion is **DENIED**.

BY THE COURT:

_____
                    J.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TADEUSZ STROSIN and KRYSTYNA STROSIN, | |
| Plaintiffs | NO. 5:14-cv-07085-LS |
| v. | |
| THE J.M. SMUCKER COMPANY and THE FOLGERS COFFEE COMPANY and EXEL LOGISTICS, | |
| Defendants | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs respectfully submit the within Response in opposition to Defendants' Motion for Partial Summary Judgment. The bases for Plaintiffs' Response in opposition are set forth in the accompanying Response to Statement of Undisputed Material Facts and Memorandum of Law, which are incorporated herein by reference.

WHEREFORE, Plaintiffs respectfully request that Defendants' Motion for Partial Summary Judgment be denied.

TUCKER LAW GROUP, LLC

Dated: March 16, 2016

By:  /s/Kathleen Kirkpatrick
      Joe H. Tucker, Jr., Esquire
      Kathleen Kirkpatrick, Esquire
      1617 JFK Boulevard, Suite 1700
      Philadelphia, PA  19103
      (215) 875-0609
      Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TADEUSZ STROSIN and KRYSTYNA STROSIN,<br>                              Plaintiffs<br><br>                    v.<br><br>THE J.M. SMUCKER COMPANY<br>                    and<br>THE FOLGERS COFFEE COMPANY<br>                    and<br>EXEL LOGISTICS,<br>                              Defendants | NO. 5:14-cv-07085-LS |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED
MATERIAL FACTS**

Plaintiffs respectfully submit the within response in opposition to Defendants'

Statement of Undisputed Material Facts as follows:

1.-12.  Admitted upon information and belief and the representation of

Defendants.

13.-14. Denied. The citations referenced by Defendants in paragraph 13 and 14

do not support the facts averred. By way of further response, it is undisputed that

Smucker owned the LaCombe warehouse facility where the subject Folgers coffee cans

were negligently loaded. (Deposition transcript of Phillip Trendell, Exhibit F to

Defendants' Motion for Partial Summary Judgment (Trendell Dep.") 9:23-10:6.)

Smucker hired Exel to come to its warehouse to perform certain, limited warehousing

operations. (Trendell Dep. 9:23-10:6.)  Through this, Smucker entered into a contract

with Exel wherein it required Exel to comply with industry standards with respect to its

loading procedures and handling of its Folgers coffee. (Deposition transcript of Linda

Wacker, Exhibit E to Defendants' Motion for Partial Summary Judgment ("Wacker

Dep.") 25:20-26:8; 19:16-17; Trendell Dep. 48:18-49:1.) The purpose of Smucker's inclusion of this provision in the contract was to ensure that its coffee arrives to the customer in good condition. (Wacker Dep. 26:5-8.) One of the dangers in not ensuring that Exel met industry standards with respect to loading procedures was that the product could fall out of a trailer (Trendell Dep. 78:8-79:3), which is precisely what happened in this matter.  Linda Wacker, Smucker employee and Warehouse Leader at LaCombe, was responsible for ensuring that Exel met its obligations under the contract. (Trendell Dep. 22:16-18.)  Despite Smucker's acknowledgment that it owed a duty to ensure that its coffee was loaded in accordance with industry standards, Smucker took no steps to ensure or monitor whether Exel followed industry standards. (Wacker Dep. 20:10-16; Trendell Dep. 48:8-11)

Smucker maintained control over Exel's operations. Not only did Smucker own the warehouse, it maintained an on-site presence at the warehouse.  (Wacker Dep. 10:7-9; 16:11-24.)  Wacker was permanently stationed at the LaCombe facility. (Id. at 10:7-9.)  She acted as the liaison between Smucker and Exel and specifically monitored Exel's progress in accordance with the contract, including its shipping and receiving targets. (Id. at 10:2-23.)  She met daily with Exel's general manager, Doug Haynes. (Id. at 15:18-25.) Other Smucker employees were also on site at the LaCombe facility, including Tyrone Claude. (Id. at 16:11-17:9.)  Smucker provided the computer programs that Exel used with respect to its shipping, and had equal access to these programs with Exel. (Wacker Dep. 14:11-15:14; Trendell Dep. 67:2-5.) Exel employees inputted the information and Smucker had complete and unfettered access to it.  (Id.)  Indeed, Wacker's performance of her job in monitoring Exel relied entirely on information she

obtained from the Smucker program that Exel employees used, and meetings with the Exel General Manager. (Wacker Dep. 13:8-15:25.)  Overall, the warehouse facility was owned and operated by Smucker. Smucker hired Exel to perform certain functions for its benefit, all of which Smucker retained absolute control over and admits that it had a duty to ensure was done in accordance with industry standards. (Wacker Dep. 25:10-26:4; Trendell Dep. 47:16-17; 48:18-23; 22:16-18.)

15.-16.  Denied as stated. Smucker contracted with Exel to handle certain, but not all, aspects of packaging its coffee. (Trendell Dep. 9:23-10:6; 44:9:15; 45:5-46:24.) Smucker owned the facility where the coffee was negligently loaded and where Exel employees worked. (Trendell Dep. 9:23-10:6.) Smucker placed the subject coffee cans on the subject pallet, and then applied shrink wrap around the pallet and coffee cans. (Wacker 26:11-18; 27:6-8; Trendell 42:10-12; 44:9-14; 45:5-17.) Exel then negligently loaded the pallets and cans onto the subject trailer. (Trendell Dep. 44:9:15; 45:5-46:24.)

In selecting a vender to provide warehousing services for its products, Smucker knew that Exel must comply with industry standards.  (Wacker Dep. 25:20-26:8; 19:16-17; Trendell Dep. 48:18-49:1.)  Smucker's knowledge of this importance is underscored by the fact that its contract with Exel contains a provision that Exel must comply with industry standards. (Wacker Dep. 25:20-26:8; 19:16-17; Trendell Dep. 48:18-49:1.) Indeed, Smucker maintained an on-site presence at the facility, via Linda Wacker and others (Wacker Dep. at 8:5-9; 10:7-9; 16:11-24). Wacker was the Warehouse Leader at the facility where the subject cargo was loaded and was responsible for overseeing Exel's warehousing operations (Trendell Dep. 22:1-11), including Exel's loading of products (Trendell Dep. 21:22-24). Wacker met daily with Exel's General Manager and

monitored and analyzed Exel's data (Wacker Dep 14:11-15:25). Even so, Smucker

ignored any problems with Exel's loading techniques (Trendell Dep. 20:2-16; 48:8-11;

Wacker Dep. 23:21-24:5; Documents pertaining to prior incidents of improper loading,

attached as Exhibit A "Prior Incident Docs")) including two prior incidents where Exel

improperly loaded cargo, causing bodily injury (Prior Incident Docs; Wacker Dep.22:12-

15; 24:6-8;  Trendell Dep. 51:11-14).  The two prior incidents involving alleged improper

loading occurred in February 2013 and March 2009, respectively. (Prior Incident docs.)

Smucker expected Exel to notify it if there were instances of bodily injury resulting from

improper loading. (Trendell Dep. 49:2-53:5.)  However, Smucker had no knowledge of

these prior incidents (Trendell Dep. 49:2-53:5), evidencing its improper selection,

retention and supervision of Exel.

Smucker's selection of Exel to handle the loading of its coffee cans was

inadequate. Plaintiffs' liability expert, Roland Brown, opines that Smucker and Folgers

were negligent in this matter and delineates their duties as follows:

> J.M. Smuckers and Folgers Coffee are multi-million dollar manufacturers, and
> distributors of a variety of products. It would be incumbent upon these companies
> to carefully and professionally select competent service providers for the
> handling and transporting of their cargo. It is my opinion that they were not
> successful in accomplishing this process . . . Each of these failures were below
> industry standards and caused the cargo to shift during transport and injured Mr.
> Strosin when he opened the rear door because he had no knowledge of Exel's
> failure. It is more likely than not that this incident and injuries would not have
> happened had proper processes and procedures been implemented by the
> defendants [J.M. Smucker Company and The Folger's Coffee Company].

(Report and Curriculum Vitae of Roland Brown, attached as Exhibit B ("Brown Rpt."), p.

7, ¶G.)

The trailer was loaded on behalf of Smucker and Folgers, as it was their product.

Indeed, Sumcker prepared the coffee, shrink wrapped it and provided it to Exel for the

next step. (Wacker Dep. 26:11-18; 27:6-8; Trendell Dep. 42:10-12; 44:9-14; 45:5-17.)

To separate the duties and actions of Exel from those of Smucker in this matter is

infeasible, impossible and a constrain of logic and reality. It was Smucker's facility,

Smucker was intimately involved in every step of the packaging loading and

transporting process and its participation in this process cannot be extracted or reduced

simply because it hired a company to assist with aspects of it.

 Defendants point to testimony of Linda Wacker to support their position, including

her admissions that Smucker took no steps to ensure that Exel operated in accordance

with industry standards. This testimony actually supports liability against Smucker.

Smucker's lack of care and derelict in its duty to ensure that its products were properly

and safely loaded was the cause of Mr. Strosin's injuries. (Brown Rpt., p.7.)

 Defendants are attempting to shift their duty to Exel and have this Court

determine, as a matter of law, that this shifting absolves them from liability. However,

given the expert opinion of Brown, the factual record demonstrating that Smucker knew

it had a duty to ensure that its products were loaded and handled properly, the fact that

it took no action to ensure that this duty was met, and its retention of control over Exel's

actions, there is a question of material fact for the jury to decide.

 17. Denied as stated. Smucker maintained control over how its products were

packaged, loaded and transported.  Indeed, Smucker affirmatively selected Exel to

handle this aspect of its work, and had every right and opportunity to ensure compliance

with industry standards. (Trendell Dep. 19:12-16.;22:16-18; 47:16-17; 48:18-23; Wacker

Dep. 25:10-26:4.) Smucker should have carefully and professionally selected a

competent vendor for these tasks. (Brown Rpt. at p. 7.)

18.-20.      Admitted. Indeed, Smucker's lack of undertaking of any measures to ensure that its products were properly packaged, loaded and transported, is further factual evidence of its negligence. (Trendell Dep. 48:8-11; Wacker Dep. 20:10-16.) Smucker failed to ensure that its products were handled in accordance with industry standards. (Wacker Dep. 20:2-16; 25:20-26:8; Trendell Dep. 48:18-23; Brown Rpt., p. 7) It failed to select a competent vendor and failed to manage the vendor's operations. (Brown Rpt., p. 7.)  Had Smucker been diligent in learning about Exel, it would have discovered that Exel had prior instances of improper loading. (Prior Incident Docs; Trendell Dep. 51:11-14; Wacker Dep. 22:12-15; 24:6-8.)  This evidences the improper selection of Exel and lack of duty to ensure that its products were loaded in accordance with industry standards.

21.-22.      Admitted but irrelevant as to Smucker's duty to ensure that its products were safely and properly packaged, loaded and transported in accordance with industry standards. (Brown Rpt.)

23.      Admitted. Smucker made no effort whatsoever to ensure that its products were being properly and safely loaded and transported. (Trendell Dep. 48:8-11; Wacker Dep. 20:10-16.)  It breached its duty to ensure that it selected a vendor that would do so. (Brown Rpt., p. 7.)

24.      Denied as stated. First, the "Exhibit E" citation referenced by Defendants in paragraph 24 does not support the fact averred.  By way of further response, Smucker's lack of knowledge of Exel's history or abilities is precisely the reason it breached its duty to Mr. Strosin. (Brown Rpt., p. 7.)

25.      Admitted.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Date: March 16, 2016                    By:  /s/ Kathleen Kirkpatrick
                                             Joe H. Tucker, Jr., Esquire
                                             Kathleen Kirkpatrick, Esquire
                                             1617 JFK Boulevard, Suite 1700
                                             Philadelphia, PA  19103
                                             (215) 875-0609
                                             Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TADEUSZ STROSIN and KRYSTYNA
STROSIN,
                      Plaintiffs

          v.

THE J.M. SMUCKER COMPANY
         and
THE FOLGERS COFFEE COMPANY
         and
EXEL LOGISTICS,
                    Defendants

NO. 5:14-cv-07085-LS

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs, Tadeusz Strosin ("Mr. Strosin") and Krystyna Strosin ("Plaintiffs"), file the within response in opposition to Defendants' Motion for Partial Summary Judgment.

### A.  Standard for motion for summary judgment

Summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.C.P. 56(c).  The court's task is not to resolve disputed issues of fact but to determine whether there exists any factual issues to be tried.  Andersen v. Liberty Lobby, Inc., 477 U.S. 242, 247-49 (1986).  In making - this determination, all of the facts must be viewed in the light most favorable to the non-moving party.  Id. at 248.  The party seeking summary judgment bears the burden of demonstrating that the record evidences an absence of genuine issues as to all material

facts and that the moving party is entitled to judgment as a matter of law.  Fed.R.C.P.
56(c).

   **B.  The facts of record support Defendants' duty and its breach of that duty.**

   It is undisputed that Smucker owned the LaCombe warehouse facility where the
subject Folgers coffee cans were negligently loaded. (Deposition transcript of Phillip
Trendell, Exhibit F to Defendants' Motion for Partial Summary Judgment (Trendell
Dep.") 9:23-10:6.) Smucker hired Exel to come to its warehouse to perform certain,
limited warehousing operations. (Trendell Dep. 9:23-10:6.)  Through this, Smucker
entered into a contract with Exel wherein it required Exel to comply with industry
standards with respect to its loading procedures and handling of its Folgers coffee.
(Deposition transcript of Linda Wacker, Exhibit E to Defendants' Motion for Partial
Summary Judgment ("Wacker Dep.") 25:20-26:8; 19:16-17; Trendell Dep. 48:18-49:1.)
The purpose of Smucker's inclusion of this provision in the contract was to ensure that
its coffee arrives at the customer in good condition. (Wacker Dep. 26:5-8.) One of the
dangers in not ensuring that Exel met industry standards with respect to loading
procedures was that product could fall out of a trailer (Trendell Dep. 78:8-79:3), which is
precisely what happened in this matter.  Linda Wacker, Smucker employee and
Warehouse Leader at LaCombe, was responsible for ensuring that Exel met its
obligations under the contract. (Trendell Dep. 22:16-18.)  Despite Smucker's
acknowledgment that it owed a duty to ensure that its coffee was loaded in accordance
with industry standards, Smucker took no steps to ensure or monitor whether Exel
followed industry standards. (Wacker Dep. 20:10-16; Trendell Dep. 48:8-11)

Smucker maintained control over Exel's operations. Not only did Smucker own the warehouse, it maintained an on-site presence at the warehouse. (Wacker Dep. 10:7-9; 16:11-24.)  Wacker was permanently stationed at the LaCombe facility. (Id. at 10:7-9.)  She acted as the liaison between Smucker and Exel and specifically monitored Exel's progress in accordance with the contract, including its shipping and receiving targets. (Id. at 10:2-23.)  She met daily with Exel's general manager, Doug Haynes. (Id. at 15:18-25.) Other Smucker employees were also on site at the LaCombe facility, including Tyrone Claude. (Id. at 16:11-17:9.)  Smucker provided the computer programs that Exel used with respect to its shipping, and had equal access to these programs with Exel. (Wacker Dep. 14:11-15:14; Trendell Dep. 67:2-5.) Exel employees inputted the information and Smucker had complete and unfettered access to it.  (Id.)  Indeed, Wacker's performance of her job in monitoring Exel relied entirely on information she obtained from the Smucker program that Exel employees used, and meetings with the Exel General Manager. (Wacker Dep. 13:8-15:25.)  Overall, the warehouse facility was owned by Smucker and ran and managed by Smucker. Smucker hired Exel to perform certain functions for its benefit, all of which Smucker retained absolute control over and admits that it had a duty to ensure was done in accordance with industry standards. (Wacker Dep. 25:10-26:4; Trendell Dep. 47:16-17; 48:18-23; 22:16-18.)

In selecting a vender to provide warehousing services for its products, Smucker knew that Exel must comply with industry standards.  (Wacker Dep. 25:20-26:8; 19:16-17; Trendell Dep. 48:18-49:1.)  Smucker's knowledge of this importance is underscored by the fact that its contract with Exel contains a provision that Exel must comply with industry standards. (Wacker Dep. 25:20-26:8; 19:16-17; Trendell Dep. 48:18-49:1.)

Even so, Smucker ignored any problems with Exel's loading techniques (Trendell Dep. 20:2-16; 48:8-11; Wacker Dep. 23:21-24:5; Documents pertaining to prior incidents of improper loading, attached as Exhibit A "Prior Incident Docs")) including two prior incidents where Exel improperly loaded cargo, causing bodily injury (Prior Incident Docs; Wacker Dep.22:12-15; 24:6-8;  Trendell Dep. 51:11-14).   The two prior incidents involving alleged improper loading occurred in February 2013 and March 2009, respectively. (Prior Incident docs.)  Smucker expected Exel to notify it if there were instances of bodily injury resulting from improper loading. (Trendell Dep. 49:2-53:5.) However, Smucker had no knowledge of these prior incidents (Trendell Dep. 49:2-53:5), evidencing its improper selection, retention and supervision of Exel.

Smucker's selection of Exel to handle the loading of its coffee cans was inadequate. Plaintiffs' liability expert, Roland Brown, opines that Smucker and Folgers were negligent in this matter and delineates their duties as follows:

> J.M. Smuckers and Folgers Coffee are multi-million dollar manufacturers, and distributors of a variety of products. It would be incumbent upon these companies to carefully and professionally select competent service providers for the handling and transporting of their cargo. It is my opinion that they were not successful in accomplishing this process . . . Each of these failures were below industry standards and caused the cargo to shift during transport and injured Mr. Strosin when he opened the rear door because he had no knowledge of Exel's failure. It is more likely than not that this incident and injuries would not have happened had proper processes and procedures been implemented by the defendants [J.M. Smucker Company and The Folger's Coffee Company].

(Brown Rpt., p. 7, ¶G.)

### C. The record demonstrates a genuine issue of material fact regarding Defendants' duty and its breach of that duty.

Defendants owed a non-delegable duty to ensure that its product, coffee, was loaded in a safe manner and in accordance with industry standards. LaChance v. Michael Baker Corp., 869 A.2d 1054, 1057 (Pa.Cmwlth 2005) (a landowner that retains

and exercises control over the work of the independent contractor may be held liable for the failure to exercise that control reasonably).   Defendants admit that they maintained this duty as well as control over the loading functions for its products.

Pennsylvania Courts have adopted Section 416 of the Restatement Second of Torts to define the scope of duty of care owed by one who employs independent contractors which states, as follows in pertinent part:

> One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.

Heath v. Huth Eng'rs, Inc., 420 A.2d 758, 759 (Pa. Super. Ct. 1980) citing Philadelphia Electric Company v. James Julian, Inc., 228 A.2d 669 (Pa. 1967); See also Restat 2d of Torts, § 416 (2nd 1979).  Comment C of Section 416 clarifies the extent of duties when employing independent contractors as follows:

> This section deals with the liability of one who employs a contractor to do such work, even though he stipulates in his contract or in a contract with another independent contractor that the precautions shall be taken, for bodily harm caused by the negligent failure of either contractor to take such precautions.
>
> \*       \*       \*
>
> However, the fact that the contract contains express stipulations for the taking of adequate precautions and that the contractor agrees to assume all liability for harm caused by his failure to do so, does not relieve his employer from the liability stated in this Section.

See Restat 2d of Torts, § 416 CMT C (1979); See also Somers v. Butler's Disposal Co., 6 Pa. D. & C.5th 530, 535-536 (Pa. County Ct. 2006) citing  Gilbert v. Korvette's Inc., 327 A.2d 94 (Pa. 1974) (a contract may create a duty which requires a party to the

agreement to use due care in performing the contract for the benefit of the other party to the agreement, as well as for third parties who are strangers to the contract.)

The contract between an employer and subcontractor creates a non-delegable duty when the contracting party provides a service that is not only intended for use by the other contracting party, but also to third persons who regularly use the contracted services for their intended purpose. Somers, 6 Pa. D. & C.5th 530, 535-536 (Pa. County Ct. 2006) citing Hess, 504 A.2d 332 (Pa. Super. 1986) (an electrical contractor under contract with a coal processing plant owed a duty to the coal processing plant's employee.)  The employer need not exercise control over the work site to impose liability under Section 416. See Heath, 420 A.2d 758.

Heath is dispositive of this matter.  In Heath, the decedent was killed when a trench in which he was working collapsed.  The decedent worked for a sewer construction company, installing sewer lines for the Lancaster Area Sewer Authority under contract. Id. at 758.   An engineering firm, Huth, was the sewer company's consulting engineer on the project and performed its duties based on a contract between Huth and the sewer company. Id. at 758. After the incident, an investigation revealed that the lateral brace was not secured against collapse in violation of state and federal safety standards. Id.  Heath upheld a jury's finding of the sewer company liable in accordance with Section 416.

Here, Smucker owned the LaCombe warehouse where the subject coffee was negligently loaded (Trendell Dep. 9:23-10), and it maintained control over all aspects of the coffee's packaging and loading. (Wacker Dep. 25:10-26:4; 16:11-17:9; 14:11-15:14; Trendell Dep. 47:16-17; 48:18-23; 21:22-24; 22:16-18; 78:8-79:3; 67:2-5.)  Smucker

brought Exel into its LaCombe facility merely to assist with a discrete aspect of its operations. (Trendell Dep. 9:23-10:6.)  Indeed, the subject coffee cans were loaded on the pallets and shrink wrapped by Smucker. (Wacker Dep. 26:11-18; 27:6-8; Trendell Dep. 42:10-12; 44:9-14; 45:5-17.)  Smucker admits that it was required to ensure that its coffee was loaded in accordance with industry standards. (Wacker Dep. 25:10-26:4; Trendell Dep. 47:16-17; 48:18-23; 22:16-18; 78:8-79:3.)  This was the case regardless of whether it hired a third party to perform this discrete function.  To separate the duties and actions of Exel from those of Smucker in this matter is infeasible, impossible and a constrain of logic and reality. Exel's participation in Smucker's overall operations cannot be extracted or reduced simply because it hired a company to assist with aspects of the operation.

Defendants point to testimony of Linda Wacker to support their position, including her admissions that Smucker took no steps to ensure that Exel operated in accordance with industry standards. This testimony actually supports liability against Smucker. Smucker's lack of care and derelict in its duty to ensure that its products were properly and safely loaded was the cause of Mr. Strosin's injuries. (Brown Rpt., p.7.)

Defendants are attempting to shift their duty to Exel and have this Court determine, as a matter of law, that this shifting absolves them from liability. However, given the opinion of Brown and the factual record demonstrating that Smucker knew it had a duty to ensure that its products were loaded and handled properly, and the fact that they took no action to ensure that this duty was met, and its retention of control over Exel's actions, there is a question of material fact for the jury to decide.

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motion for Partial Summary Judgment.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Date: March 16, 2016                    By:   /s/ Kathleen Kirkpatrick
                                              Joe H. Tucker, Jr., Esquire
                                              Kathleen Kirkpatrick, Esquire
                                              1617 JFK Boulevard, Suite 1700
                                              Philadelphia, PA  19103
                                              (215) 875-0609
                                              Attorneys for Plaintiffs

# EXHIBIT A

Casualty Claim Report

**Generated By:**

Renee Blatt

DHL Holdings (USA), Inc.

11/9/2015 2:14 PM

Filtered By:

Show: All casualty claims

Date Field: Date of Loss equals Custom (5/15/2008 to 5/15/2013)

Coverage Major equals GL

AND Cause equals Falling Object

| Casualty Claim: Claim Number | Date of Loss | Claimant Name | Location Code | Accident Description |
|---|---|---|---|---|
| 9033014150001 | 3/8/2009 | Sumpter, Floyd | A1166 | While opening the dock door a pallet fell off the stack in the trailer and struck the claimant's foot. The claimant has sustained a contusion to his left foot. |
| 1182320510001 | 5/15/2013 | Strosin, Tadeusz | A1730 | Third party customer who was standing outside the vehicle was struck by products that fell from the vehicle on his right ankle. |
| 1193321510001 | 2/26/2013 | Brown, Brett | A1739 | A driver was opening up the back of a trailer at a ▇▇▇▇▇▇ (product loaded at company location) for unloading when product fell out of the trailer on top of him. The driver fractured both of his legs. |

Confidential Information - Do Not Distribute

Copyright (c) 2000-2015 salesforce.com, inc. All rights reserved.

EXEL 458

EXHIBIT B

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **TADEUSZ STROSIN and** | **CIVIL ACTION** |
| **KRYSTYNA STROSIN** | **NO.  5:14-cv-07085-LS** |
| **Plaintiffs,** | |
| | |
| **VERSUS** | |
| | |
| **EXEL LOGISTICS, et al.** | |
| **Defendants** | |

## <u>REPORT OF EXPERT WITNESS ROLAND B. BROWN</u>

My name is Roland B. Brown.  I am the President/Owner of National Trucking Safety Consultants LLC, a transportation consulting company, based in Navarre, FL. I have been employed in the trucking and motor fleet industry for over 35 years.  I have held positions as regional safety supervisor, division manager, vice president of safety and personnel, safety and personnel director, and vice president/co-owner of 2 trucking companies.  This work experience includes working for various types of trucking and motor fleet operations, such as long-haul over-the-road companies, smaller operations including store-door deliveries, utilizing a variety of types of trucks, including Commercial Motor Vehicles and smaller than CMVs. I have personally trained 250 – 300 individuals to become licensed commercial truck drivers.

My work experience includes working for companies operating commercial motor vehicles as well as smaller vehicles not designed or registered as commercial motor vehicles. I have held day-to-day supervision, directed in developing safety programs, hiring, training, supervising, and disciplining of drivers.  Through my work experience and training programs, I

1

have become familiar and worked with regulatory agencies, both state and federal regulations. I am familiar and have utilized custom and ordinary practices and standards of the safe operations of all types of motor vehicles.

I have earned certification by North American Transportation Management Institute (NATMI), the training division of the American Trucking Association, as a Certified Driver Trainer and Certified Director of Safety. These certifications are achieved through personal experience in each field of work, meeting high standards of testing and full knowledge of the programs and procedures of the Training Institute. I have remained informed of the trucking industry of safety policies, procedures and practices through membership in numerous state trucking associations, the National Safety Council, as well as attendance at recognized industry leading seminars. I served from time to time as an instructor in two of the nation's leading training programs attended by various levels of management within the motor fleet and trucking industry. Further details of my experience and qualifications are included in the attached curriculum vitae.

## DOCUMENTS REVEIWED BY ROLAND B. BROWN

1) DEFENDANTS' RULE 26(a)(1) INITIAL DISCLOSURES

2) DEPOSITION TRANSCRIPT OF PHILLIP TRENDELL, TAKEN ON NOVEMBER 23, 2015.

3) DEPOSITION TRANSCRIPT OF DEWEY "DJ" LEVRON, TAKEN ON DECEMBER 1, 2015

4) DEPOSITION TRANSCRIPT OF TYRONE NEAL THEALL, JR., TAKEN ON DECEMBER 1, 2015

5) DEPOSITION TRANSCRIPT OF LINDA LOUISE WHACKER, TAKEN ON DECEMBER 1, 2015

6) DEPOSITION TRANSCRIPT OF CLARENCE "CLANCY" ALBERT PHILLIPS, TAKEN ON DECEMBER 1, 2015

7) DEPOSITION TRANSCRIPT OF DOUG HAYNES, TAKEN ON DECEMBER 9, 2015

8) DEPOSITION TRANSCRIPT OF PHILLIP STOCKDALE, TAKEN ON DECEMBER 11, 2015

9) DEPOSITION TRANSCRIPT OF BARRY KOCH, TAKEN ON DECEMBER 11, 2015

10) DEPOSITION TRANSCRIPT OF COLEMAN BEMELMAN, TAKEN ON DECEMBER 29, 2015

11) DEPOSITION TRANSCRIPT OF MATTHEW GARDNER, TAKEN ON DECEMBER 29, 2015

12) DEPOSITION TRANSCRIPT OF SAMUEL NUTTALL, TAKEN ON DECEMBER 29, 2015

13) DEPOSITION TRANSACRIPT OF JOHN KIEFF, TAKEN ON JANUARY 5, 2016

14) PLAINTIFFS' RESPONSES TO THE J.M. SMUCKER COMPANY, THE FOLGERS COFFEE COMPANY AND EXEL LOGISTICS' INTERROGATORIES

15) DEFENDANTS THE J.M. SMUCKER COMPANY, THE FOLGERS COFFEE COMPANY AND EXEL LOGISTICS' ANSWERS AND OBJECTIONS TO PLAINTIFFS' INTERROGATORIES

16) 9-1-1 CENTER AUDIO RECORDING/PRINTED REQUEST FORM

17) EVANS DELIVERY COMPANY LEASE TERMINATION DATED 5/29/2013

18) STROSIN- INDEX OF BATES-STAMPED DOCUMENTS PRODUCED BY PLAINTIFF

19) UPPER MACUNGIE TOWNSHIP POLICE DEPT. INCIDENT REPORT FORM

20) PROOF OF DELIVERY EQUIPMENT RECEIPT

21) 5/8/13 ACTIVITY REPORT

22) EXEL 0034-0129 PRODUCED BY DEFENDANTS

23) MISCELLANEOUS CORRESPONDANCE


## REPORT AND OPINIONS OF ROLAND BROWN


The incident that is the basis of this litigation happened in Breinigsville, PA on or about May 15, 2013. Tadeusz Strosin, opened the rear doors of a container-type trailer, and merchandise that was not properly stabilized fell on Mr. Strosin causing injuries to him. The trailer was loaded with merchandise in Lacombe, Louisiana by Exel on behalf of Folgers Coffee and J.M. Smucker Company by employees of Exel.


A) The events that lead to Mr. Strosin being injured have been known to occur within the freight handling and freight moving industry for many years and can be prevented with reasonable care by companies such as Exel. For example, if adequate training and supervision of employees within the freight industry are exercised, these types of incidents and injuries can be prevented. The industry has initiated and developed products to assist in eliminating many of these incidents. Some of these innovations will suffice if used by a single device, but many of them should be used in conjunction with other devices.  These devices were available in May 2013 and should have been utilized by Excel. Exel's failure to utilize these devices fell below the standard of care for companies like Exel and caused Mr. Strosin to be injured.

4

B) In the matter at hand, there has been testimony that cargo "air-bags" were utilized in an effort to prevent shifting of cargo; however I fail to glean any evidence that "air-bags" were utilized in an effort to prevent forward/backward shifting of palletized cargo. Such devices are not recommended or used by professionals within the freight industry. What has been referenced as possibly being "air-bags" appear to be deflated and a flat item. This could not have been adequate to preventing shifting since these items are flat or deflated and could not have been providing any cushion or securement. What has been identified as possibly being "air-bags" from photos of the trailer cannot be emphatically stated to be "air-bags". The primary purpose and use of air-bags is to prevent palletized units from shifting from side to side; thus damaging cargo from rubbing against other cargo.

C) A device introduced to the freight industry several years prior to this accident that has served very useful purposes is called load-lock bars or logistics bars, this item is very helpful in preventing cargo from shifting forward or backward so that accidents like Mr. Strosin's are prevented. The use of these bars is to be extended from one side of the trailer to the other firmly affixed to cargo, such as palletized material. It is securely positioned by utilizing a ratchet action to adjust the length of the bar in order to firmly hold against the interior walls of the trailer. It is my opinion that the failure to have such bars in place was unacceptable and was below industry standards. It is my opinion that the use of such bars across the end of the trailer at issue in this matter would have prevented cargo from falling out of the back of the trailer, which was what happened in this incident.

D) One of the innovations introduced to the freight industry several years ago was the use of "shrink-wrap" or "twist-wrap" in order to create a unitized product onto a pallet or other substantial frame.  While this system is very beneficial in holding loose packages or multi-sized items into a unit, this system must also be combined with some other product that will prevent the entire unit from shifting or falling. Such is the case in this matter, since the testimony and other evidence is that at least one unitized pallet fell out of the trailer when one rear door was opened by Mr. Strosin.

E) A more recent innovation utilized within the freight industry has been called a "belly-belt" or "belly-strap". This device was also available to Exel in May 2013. This device could have been provided by DSC Logistics and/or Evans/Land Companies, if it knew that Exel was utilizing "air bags" which would not adequately prevent the cargo from shifting during transport. The first knowledge of the load configuration was when the rear door was opened in Breinigsville, PA, and that was too late to prevent this accident.

F) These devices are relatively inexpensive and can be used numerous times. These devices are attached to the outside rear portion of the trailer from left to right hinges of the rear of the trailer. They have a ratchet-type device that will allow doors to be unlatched and slightly opened but, they prevent cargo movement from forcing the rear doors completely open. Once the operator determines the condition of the cargo as it relates to the rear doors, the operator loosens the "belly-belt" or "belly-strap" until he/she has determined it is safe to completely open the rear doors. In this matter, Exel Logistics should have developed a process and procedure that would

have assured safe movement of this cargo when it would be transported from Lacombe, Louisiana to Breinigsville, PA.

G) Given that Exel Logistics is an international company that specializes in freight movement, it should have been knowledgeable in providing safe movement of cargo and should have properly trained and supervised their employees on this matter. JM Smucker and Folgers Coffee are multi-million dollar manufacturers, and distributors of a variety of products. It would be incumbent upon these companies to carefully and professionally select competent service providers for the handling and transporting of their cargo. It is my opinion that they were not successful in accomplishing this process, Exel improperly loaded the cargo. Exel failed to appropriately secure the cargo using easily obtainable safety devices. Exel failed to notify Mr. Strosin or DSC logistics and/or Evans/Land Companies of the manner it had secured the cargo. Each of these failures were below industry standards and caused the cargo to shift during transport and injured Mr. Strosin when he opened the rear door because he had no knowledge of Exel's failure. It is more likely than not that this incident and injuries would not have happened had proper processes and procedures been implemented by the defendants.

I reserve the right to amend, append, or revise this report when additional discovery material is provided to me.

1/12/2016

**_Roland B. Brown_**
P. O. Box 5840 – 2430 Knotty Pine Drive
Navarre, FL 32566
Tel. No. (850) 939-8926 – Fax No. (850) 939-5853
e-mail:  rolandbrown@mchsi.com
<u>Curriculum Vitae</u>

<u>**Name**</u>               Roland B. Brown

<u>**Address**</u>            **National Trucking Safety Consultants, LLC**
                   **P.O. Box 5840, Navarre Florida 32566; 850-939-8926**

<u>**Present Title**</u>      Transportation Safety Consultant, Chief  Managing Partner

<u>**Duties**</u>             Consult with trucking fleet operations re hiring, training and supervising
                   truck drivers; compliance with DOT, OSHA, HazMat and Environmental
                   regulations; with attorneys re accident investigation, driver qualifications,
                   safety programs, and custom and ordinary careful, safe and prudent
                   trucking industry practices.

<u>**Education and**</u>      For many years, I have attended specialized training courses, and continue
<u>**Degrees**</u>           to attend these courses, sponsored by state and national Trucking
                   Associations who have developed programs to better equip and train
                   safety managers, operations managers and top management personnel.
                   These are courses designed for people in leadership roles of motor fleet
                   and trucking companies.  I continue to regularly attend these courses in an
                   effort to better serve clients in consulting and to assist in expert witness
                   cases; and more effectively promote highway safety within the motor fleet
                   industry and transportation companies.

                   1973 & 1976, Safety Supervisor Seminars, Alabama Trucking
                   Association, Pennsylvania State University and National Committee for
                   Motor Fleet Safety, co-sponsors

                   1977, Accident Investigation Seminar, North Carolina Motor Truck
                   Association and North Carolina State University, co-sponsors

                   Certificates of Completion, Safety Supervisor Seminars and Accident
                   Investigation Seminars, at Pennsylvania State University, State College
                   Pennsylvania, and North Carolina State University

                   1993, Certificate of Completion, American Trucking Association, North
                   American Transportation Management Institute of Safety Supervisor
                   Seminar, University of Alabama

                   1999 & 2002, Certificate of Completion, American Trucking Association,
                   North American Transportation Management Institute of Safety
                   Supervisor Seminar, Richmond, Virginia

                   Certified Director of Safety by National Committee for Motor Fleet
                   Safety, State College Pennsylvania

                   <u>**Licenses:**</u>

                   Certified Director of Safety, Penn State University and National
                   Committee for Motor Fleet Safety

                   Certified Driver Trainer, North Carolina State University and National
                   Committee for Motor Fleet Safety

Roland B. Brown [cont.]
Page 2

**Teaching**
**Experience**

1976-1978, Instructor, Safety Supervisor Seminars, Alabama Trucking Association, Pennsylvania State University and National Committee for Motor Fleet Safety, co-sponsors

1978, Instructor, Accident Investigation Seminar, State Trucking Associations, North Carolina State University, and Florida State University, co-sponsors

2003 – Instructor, North American Transportation Management Institute (a division of American Trucking Association), Seminar in Atlanta, GA, for safety directors of motor fleet operations in improving accident prevention, assuring proper recordkeeping and the monitoring systems available for safety directors to monitor activities of drivers to assure compliance of regulations

2003 – Instructor, North American Transportation Management Institute (a division of American Trucking Association), Seminar in Charlotte, NC, for divisional safety supervisors, safety directors and individuals working within a safety department in assuring thorough knowledge of the new DOT "Hours of Service" Regulations and offering advise on monitoring systems available.

2004 – J. J. Keller & Associates, Inc., Neenah, WI, Seminar leader in Nashville, TN, concerning the requirements of DOT regulations and emphasizing the importance of training and re-training of motor fleet drivers in compliance with DOT and state regulatory issues

2005 – National Safety Council, Itasca, IL, Seminar co-leader in New Orleans, LA, concerning defensive driving, accident prevention, risk management programs and specific sessions for safety directors in assuring a well-organized and properly managed safety department to maximize efforts of each individual employed in a safety department

2002 – 2005 – Various state trucking association monthly and/or annual meetings, speaking on the importance of a strong safety program that is supported, endorsed and physically supervised by top management personnel.  The emphasizes were to assure top management is involved in the development, implementation and the carrying out of a safety program that meets and exceeds all regulatory agencies guidelines and industry standards.

2

Roland B. Brown [cont.]
Page 3

**<u>Job Experience</u>**     1961-1963, Regional Safety Supervisor, Hall Motor Express, Inc., Birmingham, Alabama

1965-1969, Regional Safety Supervisor & Divisional Manager, Bowman Transportation, Inc., Atlanta, Georgia

1973-1976, Vice President/Safety & Personnel, Howard Hall Co., Inc., Birmingham, Alabama

1976-1978, Director of Safety & Personnel; 1978-1979, Vice President/General Manager, Colonial Fast Freight Lines, Inc., Birmingham, Alabama

1979-1981, Vice President/General Manager, Super Truckers, Inc., Birmingham, Alabama

1981-1983, Vice President/Southern Division, Maislin/Gateway Transportation, Montreal, Canada

1983-1984, Vice President/Southern Division, American Trans-Freight, Inc., Morristown, Pennsylvania

1984-1985, Vice President/Southern Division, SM Transport, Inc., Camp Hill, Pennsylvania

1986-1990, Director of Transportation/National Sales Manager, Coral Industries, Inc./Central Alabama Transport, Inc., Tuscaloosa, Alabama

1990-1995, Vice President/Sales, Coral Industries, Inc. , Tuscaloosa, Alabama

1995-1997, National Sales Manager, Gral Corporation, Upper Marlboro, Maryland

1998-2002, Chief Operating Officer, Virginia Tank Lines, Fredericksburg, Virginia

1985 – present, President/Owner, Roland B. Brown Transportation Consultant, nka National Trucking Safety Consultants, LLC

Consult with manufacturers who are required, by nature of their core business to operate commercial motor vehicles, including setting up safety programs, implementing these programs and monitoring the programs as being carried out after I have put the procedures in place.

Consultant to Alabama Public Service Commission in driver's qualifications and safety regulatory compliance

Consultant to Georgia Public Service Commission; re: driver qualifications and equipment maintenance procedures

Consultant to Florida Public Service Commission; re: record keeping, accident investigation and records relative to accident reports, and in matters concerning driver qualifications and personnel files

3

Roland B. Brown [cont.]
Page 4

| | |
|---|---|
| **Associations and Societies** | American Trucking Association |
| | National Safety Council |
| | Alabama Trucking Association |
| | Florida Trucking Association |
| | Former member of Georgia Motor Truck Association |
| | Former member Virginia Trucking Association |
| **Publications** | |
| **Honors** | Special Commendation from Governor, State of Alabama, for special service rendered in Highway Safety Program |

**Other Pertinent Information**

2001 – Certified by North American Transportation Management Institute as an instructor to teach their curriculum in 1-week & 2-week seminars & training assignments. Regularly hold seminars at the request of NATMI throughout the East Coast area.

2003 – Certification and Examination for renewal of Certified Driver Trainer by North American Transportation Management Institute – Richmond, VA.  Regularly hold seminars at the request of NTMTI in driver training throughout areas east of the Mississippi River.

2004 – Re-certification Seminar and Examination by North American Transportation Management Institute as a Certified Director of Safety – Atlanta, GA.  Hold seminars at least 2-3 times per year in the "Re-Certification program of NATMI and am qualified to issue re-certification of Certified Director of Safety Certification.

2006 – Attended refresher course on Certified Director of Safety requirements, regulations and proposed changes in certification program for instructors, attended 5-day workshop in Alexandria, VA, sponsored by North American Transportation Management Institute

Roland B. Brown [cont.]
Page 5

References
- Howard Hall, Jr., Chairman of the Board, Howard Hall Co., Inc., Birmingham, AL
- Thomas W. McBride, President, Colonial Freight Systems, Inc., Knoxville, TN
- Albert E. Askew, President, Coral Industries, Inc., Tuscaloosa, AL
- David Noles, Sales Coordinator, Malone Freight Lines, Inc., Birmingham, AL
- Ben N. Wafle, President, Virginia Tank Lines, Inc., Fredericksburg, VA
- Gerald D. Colvin, Jr., Attorney at Law, Bishop, Colvin, Johnson & Kent, P. A., Birmingham, AL
- John L. Walker, Attorney at Law, Walker & Walker, PLLC, Jackson, MS
- Dr. Charles E. Benedict, Ph.D., P.E., President, BEC Engineering, Inc., Tallahassee, FL
- William P. Jackson, Jr., Attorney at Law, Jackson & Jessup, P. A., Arlington, VA
- Maria P. Sperando, Attorney at Law, Gary, Williams, Parenti, Finney, Lewis, McManus, & Sperando, Stuart, FL
- Robert O. Newton, Attorney at Law, Preti, Flaherty, Beliveau, Pachios & Haley, LLC., Portland, ME
- Joshua D. Silverman, Attorney at Law, Williamson & Lavecchia, L. C., Richmond, VA
- Michael W. Kehoe, Esq.; Fuller, Johnson, Kehoe & Horkey & Rettic, LLC, Attorneys at Law; Pensacola, FL 32503
- Clay H. Paulos, Attorney at Law, Sanders, Bruin, Coll & Worley, P. A., Roswell, NM
- LaBarron N. Boone, Attorney at Law, Beasley, Allen, Crow, Methvin, Portis & Miles, P.C., Montgomery, AL 36103
- Robert DiStefano, Esq., Robert P. DiStefano, P. A. Attorney at Law, Ft. Lauderdale, FL 33319
- W. Keith Noel, Attorney at Law, Keating, Muething & Klekamp, P.L.L.C., Cincinnati, OH 45202
- Andrew Wood, Attorney at Law, Wood, Wood & Young, P.S.C., Maysville, KY 41056
- Joseph J. Perez, Attorney at Law, Law Offices of Joseph J. Perez, P. C., Norfolk, VA 23510
- James A. Sigler, Attorney at Law, Whitlow, Roberts, Houston & Straub, PLLC., Paducah, KY 42001
- David L. Mazaroli, Attorney at Law, Law Offices of David L. Mazaroli, New York, New York, 10007-2801
- Gary A. Kaisen, Esq.; Milano & Wanat, LLC. Attorneys at Law, Branford, CT 06405
- H. K. "Skip" Pita, Esq., Law Offices of Pita & Del Prado, Miami, FL 33156

5

Roland B. Brown [cont.]
Page 6

- Kenneth F. Klanica, Esq.; Heintzman, Warren, Wise & Fornella, P. C., Attorneys at Law, Pittsburgh, PA 15219
- John O. Easton, Esq. Law Offices of Jordan, Coyne & Savits, LLP, Attorneys at Law, Fairfax, VA 22030
- R. Scott Constantino, Esq., Liles, Gavin, Constantino & George, Attorneys and Counselors, Jacksonville, FL 32202
- J. Farrest Taylor, Esq., Cochran, Cherry, Givens, Smith,  Lane & Taylor, Attorneys at Law, Dothan, AL 36302
- Marc A. Wites, Esquire; Wites & Kapetan, P. A., Attorneys at Law, Lighthouse Point, FL 33064